UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| C.T.M., | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:20-CV-0540-B-BT |
| MARC J. MOORE, Dallas Field Office | § | |
| Director, Immigration and Customs | § | |
| Enforcement, Department of Homeland | § | |
| Security, et al., | § | |
| | § | |
| Respondents. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Petitioner C.T.M.'s Motion for Temporary Restraining Order (TRO) (Doc. 8). After considering the parties' briefing and holding a hearing on the motion on March 12, 2020, the Court denied C.T.M.'s motion. This Order further explains the Court's reasoning.

### I.

### BACKGROUND

*A.  Legal Background*

Through the Homeland Security Act of 2002, the functions of the Immigration and Naturalization Services (INS) were split between the Department of Homeland Security (DHS) and the Department of Health and Human Services (HHS). *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002). DHS was charged with enforcing immigration law, while HHS was given the responsibility of caring for immigrant children. *See generally id.*

Further, in 2008, the William Wilberforce Trafficking Victims Protection Reauthorization

Act (TVPRA) conferred HHS with authority over "the care and custody of all unaccompanied alien children, including responsibility for their detention . . . ." 8 U.S.C. § 1232(b)(1). Accordingly, the TVPRA requires that, absent exceptional circumstances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to [HHS] not later than 72 hours after determining that such child is an unaccompanied alien child." *Id.* § 1232(b)(3). Further, the TVPRA requires that HHS, in conjunction with DHS, "develop procedures to make a prompt determination of the age of an alien, which shall be used by [DHS] and [HHS] for children in their respective custody." *Id.* § 1232(b)(4). These procedures "shall take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the unaccompanied alien." *Id.*

B.      *Factual Background*[1]

C.T.M. is a national of the Democratic Republic of the Congo (DRC). Doc. 1, Pet., ¶ 15. She alleges she was born in 2002 and is currently seventeen-years-old. *Id.* In 2014, her father attempted to arrange for her to flee the DRC due to increasing violence. *Id.* ¶ 16. Earlier that year, a group of thieves had broken into C.T.M.'s home and physically assaulted her. *Id.* In attempting to make arrangements for C.T.M. thereafter, C.T.M.'s father indicated to the U.S. Government, on a visa application, that C.T.M. was born in 1993, rather than 2002—the year she states she was born. *Id.* C.T.M.'s father regularly subjected her to physical abuse, and she did not question his misrepresentation on the visa application. *Id.* After the visa application was denied, C.T.M. remained in the DRC. *Id.*

---

[1]The facts are drawn from C.T.M.'s habeas petition and the parties' briefing on C.T.M.'s motion.

In 2016, supporters of the Kamwina Nsapu rebellion beat and sexually assaulted C.T.M. *Id.* ¶ 17. During this attack, C.T.M. was separated from her family, and she believes the rebellion caused the deaths of her immediate family members. *Id.* After C.T.M. was attacked, strangers nursed her to health and brought her to Angola, where she sought medical treatment. *Id.* ¶¶ 17–18.

While in Angola, C.T.M. worked for a Brazilian couple. When they arranged to bring her to Brazil with them, she left Angola in hopes of finding her family in the DRC. *Id.* ¶ 19. But after C.T.M. was unable to find her family and realized that the DRC was still dangerous, she flew to Brazil to meet the Brazilian couple. *Id.*

In Brazil, C.T.M. worked as the couple's housekeeper. *Id.* ¶ 20. But after about three months of C.T.M. working in their home, the couple asked C.T.M. to traffic drugs for them. *Id.* She refused, and they threatened to kill her—so she fled to Mexico. *Id.* ¶¶ 20–21.

After arriving in Mexico, C.T.M. slept in the streets until she met a man who brought her to a shelter. *Id.* ¶ 21. Through connections C.T.M. made at the shelter, she traveled to Tijuana and arrived at the U.S. border. *Id.*

On June 6, 2019, C.T.M. requested asylum. *Id.* When C.T.M. entered the United States, she told DHS that she was a minor and presented her Congolese birth certificate as evidence. *Id.* ¶ 22. Despite this evidence, however, DHS did not transfer C.T.M. to HHS, because Immigration and Customs Enforcement (ICE)—an agency of DHS—determined that she was an adult. Doc. 15-1, Resp., 2–3. Thus, C.T.M. remained in the custody of DHS. *Id.* at 3.

For the first month of her time in custody, C.T.M. was in a holding facility, where she slept on a mat on the floor. Doc. 1, Pet., ¶ 23. She was constantly hungry and could only bathe once a week. *Id.*

Due to her asylum request, C.T.M. had a credible fear interview. *Id.* ¶ 24. During the interview, she again informed the officials that she was a minor. *Id.* So ICE officials conducted a radiographic dental exam on C.T.M. to determine her age. *Id.*

On February 14, 2020—after C.T.M. was placed in removal proceedings—Immigration Judge (IJ) Barcus held an evidentiary hearing, as requested by C.T.M., to determine her age. *Id.* ¶¶ 25, 27. At the hearing, C.T.M. presented additional evidence, including school records, an affidavit from a family friend, and more testimony. *Id.* ¶ 27. She explained that her father might have previously misrepresented her age in an attempt to save her life. *Id.* IJ Barcus considered this evidence, along with the visa application submitted by C.T.M.'s father and the dental report from DHS that concluded that C.T.M. was "20.46 years old, plus or minus 4.89 years."*Id.* ¶ 28.[2] Ultimately, IJ Barcus determined that C.T.M. was a minor, and ICE waived appeal of the issue. *Id.*

Moreover, at the end of the hearing, C.T.M. told her attorney that "she was being harassed in the detention center due to her skin color." *Id.* ¶ 29. After an officer overheard this, the officer advised that C.T.M. would be separated from the rest of the population. *Id.* Accordingly, after the hearing, C.T.M. was separated from the general population at her facility. *Id.* ¶ 31. Thereafter, C.T.M. was placed on suicide watch and hospitalized once after fainting. *Id.* Further, while in ICE custody, C.T.M. participated in a "Harm Assessment," which indicated that she has untreated posttraumatic stress disorder (PTSD). Doc. 8, Mot., 14. Additionally, a recent psychiatric evaluation of C.T.M. concluded that she is experiencing symptoms of PTSD; major depressive disorder; and

---

[2] C.T.M. objected that the dental exam evidence was unreliable and filed an expert statement in support.

generalized anxiety disorder. *Id.* at 19.[3]

On the same day that IJ Barcus determined that C.T.M. is a minor, ICE officials referred C.T.M. to HHS custody based on IJ Barcus's order. Doc. 15-1, Resp., 3. Nonetheless, the Office of Refugee Resettlement (ORR)—an agency within HHS—denied placement, concluding that C.T.M. was an adult. Doc. 15-1, Resp., 3. ORR first denied placement on February 14, 2020. *Id.* Then, ORR again denied placement on February 21, 2020, after reviewing:

> CTM's college records from Brazil indicating admission in 2019; an immigration document from Congo listing the date of birth as November 27, 1996; a 'Certificate of Migration Flows' document from Brazil also indicating a birth date of November 27, 1996; a birth certificate listing the birth year as 2002; a vaccination record; and the witness list and supporting documents provided by CTM's attorney at the February 14 immigration court hearing.

Doc. 15-3, App. (Cruz Decl.), 5–6. Thus, C.T.M. remained in ICE/DHS custody.

On February 25, 2020, DHS filed a motion in immigration court, seeking a new hearing before IJ Barcus in light of ORR's placement denial. Doc. 1, Pet., ¶ 32; Doc. 15-1, Resp., 3. In the motion, DHS indicated that it sent evidence of C.T.M.'s age to ORR, and ORR determined that C.T.M. was an adult. Doc. 1, Pet., ¶ 32.

Two days after this motion was filed, C.T.M.'s counsel contacted ORR and provided it with C.T.M.'s testimony from the evidentiary hearing and her sworn affidavit. *Id.* ¶ 33. C.T.M.'s counsel submitted this additional evidence based on the belief that "ICE . . . did not send [ORR] C.T.M.'s oral testimony." *Id.* ¶ 32. But one day later, ORR responded, informing C.T.M.'s counsel that it still believed C.T.M. was an adult. *Id.* ¶ 33; *see* Doc. 15-3, App. (Cruz Decl.), 7.

---

[3] At the hearing, Respondents informed the Court that since this diagnosis, C.T.M. has returned to the general population.

Since then, IJ Barcus has held a hearing on DHS's motion, explaining that to obtain reconsideration of his age determination, DHS must file a motion requesting such relief. Doc. 15-1, Resp., 5. Accordingly, DHS intends to do so, and it has requested that C.T.M.'s counsel "provide any additional evidence of C.T.M's age that had not been previously provided to DHS." *Id.*

Given that C.T.M. is still being held as an adult, she filed her petition for writ of habeas corpus and writ of mandamus with this Court on March 2, 2020. Doc. 1, Pet. Through her petition, C.T.M. seeks release from adult detention and transfer to a facility for children. *Id.* ¶ 60.

On March 7, 2020, C.T.M. filed her motion for a TRO, seeking a TRO "directing ICE from treating C.T.M. as an adult and providing her medical treatment for her PTSD." Doc. 8, Mot. for TRO, 5.[4] On March 10, 2020, Respondents filed their response (Doc. 15). The following day, C.T.M. filed a reply (Doc. 17). Finally, on March 12, 2020, the Court held a hearing for consideration of the motion. *See* Doc. 21, Electronic Minute Entry. At the hearing, the Court denied C.T.M.'s motion for the reasons set forth below.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). To obtain a preliminary injunction, a plaintiff must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the

---

[4] Because this relief would "command[] some positive, status-quo altering act[s]," C.T.M. is seeking mandatory, rather than prohibitory, injunctive relief. *See Arbor Bend Villas Housing, L.P. v. Tarrant Cty. Housing Fin. Corp.*, 2002 WL 1285564, at *2 (N.D. Tex. June 6, 2002) (citation omitted).

injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000). "A temporary restraining order . . . is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that party seeking such relief to establish the same four elements for obtaining a preliminary injunction." *BNSF Ry. Co. v. Panhandle N. R.R. LLC*, 2016 WL 10827703, at *1 (N.D. Tex. Dec. 30, 2016) (internal quotations omitted).

In contrast with prohibitive preliminary relief, "mandatory preliminary relief, . . . which goes well beyond simply maintaining the status quo [during litigation], is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Three Expo Events, L.L.C. v. City of Dallas*, 182 F. Supp. 3d 614, 622 (N.D. Tex. 2016) (quotation marks omitted) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

## III.

## ANALYSIS

C.T.M. asserts that she has a substantial likelihood of success on the merits based on her claims under: (1) the Fifth Amendment due process clause; (2) 29 U.S.C. § 701 *et seq.*, the Rehabilitation Act; (3) 8 U.S.C. § 1232, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA); (4) 8 C.F.R. § 1236.3, the Flores Settlement Agreement (FSA); and (5) the Prison Rape Elimination Act (PREA). Doc. 8, Mot., 11. Based on the claims in C.T.M.'s pleadings, she has not established a substantial likelihood of success on the merits, as explained below.

At the hearing, C.T.M. raised a new argument: that Respondents unreasonably delayed in

conducting a proper age determination for C.T.M. from June of 2019 to February of 2020. This argument could support C.T.M.'s substantive due process and TVPRA claims. But even if the Court assumes a substantial likelihood of success on the merits based on this allegation of unreasonable delay, C.T.M. cannot show a threat of irreparable harm, because any viable allegation of irreparable harm hinges upon C.T.M.'s entitlement to the benefits of an unaccompanied minor child. *See infra* section III.B. Given, as discussed below, that Respondents likely made a lawful determination that C.T.M. is not a minor following the alleged delay, C.T.M. has not established a substantial threat of irreparable harm.

In sum, the Court concludes that C.T.M. has not established a substantial likelihood of success on the merits on the claims in her pleadings. And even if the Court were to recognize a likelihood of success on the merits based on C.T.M.'s claim of unreasonable delay, which she raised at the hearing, she has not shown a substantial threat of irreparable harm. Thus, the Court does not analyze the balance of harms or the public's interest, and **DENIES** C.T.M.'s motion for a TRO.

A. *Substantial Likelihood of Success on the Merits*

    1. Fifth Amendment Due Process Clause

        *a. Substantive due process*

As to her allegations of substantive due process violations, C.T.M. contends that because she is detained as an adult, she has less access to her legal counsel and more difficulty participating in proceedings. Doc. 1, Pet., ¶ 36. Moreover, C.T.M. alleges that "Respondents' actions are also inconsistent with the substantive due process provided by the Administrative Procedure Act, which prohibits a government agency from unreasonably withholding or delaying action." *Id.* ¶ 37 (citing 5 U.S.C. § 706(1)).

Based on her allegations, C.T.M. is unlikely to prevail on either substantive due process claim. "The standard for measuring a violation of substantive due process is conduct that 'shocks the conscience.'" *Malone Mortg. Co. Am., Ltd. v. Martinez*, 2002 WL 31114160, at *24 (N.D. Tex. Sept. 23, 2002) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). This "standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (quoting *Roseles-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018)).

C.T.M. has not alleged any conduct by Respondents that "shocks the conscience." *Malone*, 2002 WL 31114160, at *24. Her first allegation—that Respondents continue detaining C.T.M. as an adult—seems logical, given that ORR indicated to ICE that it would not take C.T.M. into custody due to its own age determination. *See* Doc. 15-1, Resp., 19. This is the only conduct to which C.T.M. points to support her claim that Respondents are hindering her from participating in her proceedings. Absent a more shocking allegation, C.T.M. is not likely to prevail on this basis.

Second, C.T.M.'s substantive due process allegation that Respondents have unreasonably delayed likewise appears to fall short. Given that "ICE officials referred C.T.M. to the custody of [ORR]" on the same day of IJ Barcus's order, and notified ORR of his order," Doc. 15-1, Resp., 3, Respondents do not appear to be unreasonably delaying. Thus, C.T.M. is unlikely to prevail on her substantive due process claim.[5]

---

[5] As discussed above, C.T.M.'s new unreasonable delay allegation does not warrant injunctive relief either, because even if she could prevail on a substantive due process claim based on the delay, she has not shown irreparable harm.

### b. *Procedural due process*

C.T.M. next contends that "ICE's age determination violated [her] procedural due process rights" because "it was based on unreliable evidence and failed to consider the totality of the evidence such as her testimony, a corroborating affidavit, and school and government records." Doc. 8, Mot., 12. In her reply brief, C.T.M. specifically emphasizes ICE's and ORR's alleged failure to consider her testimony before IJ Barcus. Doc. 17, Reply, 5.

Under the circumstances, C.T.M. is not likely to prevail on her procedural due process claim. "The requirements of procedural due process are flexible and call for such procedural protections as particular situation demands." *Gibson v. Tex. Dep't of Ins.–Div. of Workers Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) (citation and quotation marks omitted) (alteration incorporated). Ultimately, "the requirements of due process are dependent on three factors:" (1) the private interest affected; (2) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's interest. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, C.T.M. has not shown that the procedures used by Respondents were insufficient. Most notably, C.T.M.'s claim hinges on Respondents' failure to consider "the totality of the evidence." Doc. 8, Mot., 12. But not only did ORR review the evidence submitted by C.T.M., but it also considered a variety of other records. *See supra* at 5. Further, though C.T.M. disputes whether ORR actually considered her testimony, Cruz—the individual responsible for ORR's age determination—stated in his declaration that, one day after C.T.M.'s counsel emailed him the testimony, he informed both ICE and C.T.M.'s counsel that he determined C.T.M. was not a minor. Doc. 15-3, App. (Cruz Decl.), 7. In his email to C.T.M.'s counsel, Cruz explained that his conclusion

remained the same despite her additional submitted evidence, which would include the testimony. *See id.* Thus, C.T.M.'s allegation that Respondents failed to consider the totality of the evidence lacks force, and she will not likely succeed on the merits of her procedural due process claim.

2. The Rehabilitation Act

Next, C.T.M. claims that Respondents have violated the Rehabilitation Act by "fail[ing] to provide C.T.M. with medical treatment [for her PTSD] and thereby excluding her from the age determination process." Doc. 8, Mot., 14. Specifically, C.T.M. explains that she "was forced to decline an interview" with ICE "because of her mental health." *Id.* According to C.T.M., ICE's failure to provide treatment, resulting in her inability to participate in the interview, violates Section 504 of the Rehabilitation Act, which provides:

> No otherwise qualified individual with a disability in the United States . . . solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency. . . .

29 U.S.C. § 794(a).[6]

But C.T.M. lacks evidence suggesting that she was excluded from her age determination. The only evidence upon which C.T.M relies is that she had to decline an interview with ICE due to her mental health. C.T.M. has twice received the opportunity to submit evidence on her behalf through her counsel, and she even testified before IJ Barcus. Thus, C.T.M.'s Rehabilitation Act claim is unlikely to prevail.

---

[6] C.T.M. also alleges that this failure to provide medical care violates DHS's regulations implementing the Rehabilitation Act. Doc. 8, Mot., 13.

3. The William Wilberforce Trafficking Victims Protection Reauthorization Act

C.T.M. also claims that Respondents violated the TVPRA by treating C.T.M. as an adult. Doc. 8, Mot., 15–16. Specifically, C.T.M. alleges that Respondents have violated the provision of the TVPRA requiring transfer of an unaccompanied alien child to the custody of HHS within 72 hours, 8 U.S.C. § 1232(b)(3), by refusing to transfer C.T.M. to HHS custody. Doc. 8, Mot., 15–16.

The Court disagrees. Though the TVPRA requires prompt transfer of aliens determined to be unaccompanied minors, the TVPRA also provides HHS—and thus ORR—with the authority to develop procedures for age determinations. *See* 8 U.S.C. § 1232(b)(4); *see also B.I.C. v. Asher*, 2016 WL 8672760, at *2 (W.D. Wash. Feb. 19, 2016) ("The protections TVPRA affords [unaccompanied alien children] apply after the HHS, in consultation with the DHS, determines that the applicant is indeed a child." (citing 8 U.S.C. § 1232(b))). Given that ORR appeared to followed those developed procedures in conducting its own age determination, there is not likely a violation of the TVPRA. *Cf. B.I.C.*, 2016 WL 8672760, at *6 (concluding that the petitioner established a likelihood of success on his claim that ORR violated the TVPRA, which requires "the non-exclusive use of radiographs," when ORR relied "exclusively on [a] radiographic analysis" to determine petitioner's age). Accordingly, C.T.M. is not likely to prevail on the merits of her TVPRA claim.

4. The Flores Settlement Agreement[7]

Next, C.T.M. contends that Respondents have violated the FSA by failing to place C.T.M. "in a less restrictive setting" through a bond hearing. Doc. 8, Mot., 14–15. Paragraph 24 of the FSA

---

[7] When discussing the alleged violation of the FSA, C.T.M. also suggests that Respondents violated a federal regulation governing the detention of juveniles. *See* 8 C.F.R § 1236.3(d). The parties' arguments with respect to a violation of the FSA are the same as those regarding a violation of this regulation.

requires that "[a] minor in deportation proceedings shall be afforded a bond determination hearing before an immigration judge . . . ." *See* Stipulated Settlement Agreement ¶ 24, *Flores v. Reno*, No. CV-85-4544-RJK-PX (C.D. Cal. Jan. 17, 1997).

Respondents, on the other hand, argue that since they determined that C.T.M. is not a minor, the provisions of the FSA do not apply to C.T.M. *See* Doc. 15-1, Resp., 17–18.

The Court agrees with Respondents, given that the FSA provides protection only to minors who are determined to be minors. *See* Stipulated Settlement Agreement, ¶ 13. For context, the FSA was reached in 1987 in response to a constitutional challenge to INS's policies regarding unaccompanied minors. *See* Stipulated Settlement Agreement, at 3. Given that the FSA implies INS's ability to make age determinations, and INS's functions are now split between DHS and HHS, it appears that DHS or HHS may make an age determination under the FSA. Because both have done so here—through ICE and ORR, respectively—C.T.M. is not entitled to the protections of the FSA.

5.    The Prison Rape Elimination Act

Finally, C.T.M. suggests that Respondents violated the PREA, which "requires that a minor shall not 'have sight, sound, or physical contact with any adult' detainee . . . ." Doc. 8, Mot., 1 (citing 28 C.F.R. § 115.114(a)).

But C.T.M. does not have a viable claim under the PREA. The Fifth Circuit has acknowledged that "other courts . . . have found that the PREA does not establish a private cause of action for allegations of prison rape." *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015) (per curiam) (collecting cases). Likewise, district courts appear to deny any private cause of action exists under the PREA. *See, e.g.*, *Harold v. Goff*, 2016 WL 8137642, at *4 (W.D. La. Dec. 1, 2016). And,

in any event, C.T.M.'s PREA claim challenges the conditions of her confinement, but "a petitioner may not challenge the conditions of confinement through a habeas action." *Vetcher v. Sessions*, 2018 WL 4006813, at *2 (N.D. Tex. Aug. 7, 2018) (citation omitted), *adopted by* 2018 WL 4110678 (N.D. Tex. Aug. 28, 2018). Thus, C.T.M.'s PREA claim fails.

B.  *Substantial Threat of Irreparable Injury*

C.T.M. first contends that, if she is detained as an adult, she will face irreparable harm "because she will be deprived of her right to effectively participate in the administrative proceedings relating to her claim." Doc. 8, Mot., 18. C.T.M. describes the severe trauma she has faced, resulting in her recent hospitalization, mental illness diagnoses, and the prescription of psychotropic medications. *Id.* at 18–19. While being detained as an adult, C.T.M. states, her mental health treatment has included "a mental health/psychiatry line, recommendations of wellness activities of which include exercise, reading, art etc." *Id.* at 19. C.T.M. contends that she "is in need of more intensive mental health treatment," and she appears to suggest that unaccompanied minors in HHS custody receive superior care. *See id.* Additionally, C.T.M. contends that her detention deprives her of the opportunity to be "placed in the least restrictive setting . . . ." *Id.* at 20.

Based on the facts presented, C.T.M. has not established a substantial threat of irreparable injury. First, as previously discussed, there is little evidence suggesting that C.T.M. has been excluded from her age determination. Second, while the Court recognizes C.T.M.'s diagnoses, she is receiving mental health treatment, including appointments with professionals, counseling, and psychotropic medications. *Id.* at 19; Doc. 15-1, Resp., 21. Though ORR might offer additional mental health services, C.T.M. has not established that without a transfer to ORR custody, she faces a substantial threat of irreparable injury.

As to C.T.M.'s third contention—that she is not held in a less restrictive setting—the Court recognizes that this could constitute irreparable harm. But C.T.M. is only entitled to a less restrictive placement under the TVPRA if she is, indeed, determined to be a minor. Thus, whether C.T.M. faces a substantial threat of this harm is intertwined with the merits of C.T.M.'s claims. Because the Court concluded that C.T.M. is unlikely to prevail on the merits of her claims challenging ORR's most recent age determination, which found that C.T.M. was not a minor, the Court cannot logically conclude that C.T.M. faces a substantial threat of being deprived of a less restrictive setting. *Cf.* Order at 12–13, *I.J. v. Keeton*, No. CV-19-01904-SMB (D. Ariz. Apr. 17, 2019), ECF No. 15 (finding a likelihood of irreparable harm based on the petitioner's inability to be placed in the least restrictive setting after concluding that ORR's age determination, which found that the petitioner was an adult, contravened the TVPRA).

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** C.T.M.'s motion for a TRO (Doc. 8).

**SO ORDERED.**

**SIGNED: March 16, 2020.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE