IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| C.T.M. | § | |
|      Petitioner, | § | |
| | § | |
| v. | § | No. 3:20-cv-540-B (BT) |
| | § | |
| MARC J. MOORE, Dallas Field | § | |
| Office Director, Immigration and | § | |
| Customs Enforcement, Dept. of | § | |
| Homeland Security, et al., | § | |
|      Respondents. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

C.T.M., a national of the Democratic Republic of Congo (DRC), filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, in which she claims she is a minor in the custody of Immigration and Customs Enforcement (ICE) at the Prairieland Detention Facility (Prairieland) pending removal proceedings. C.T.M. asks the Court to mandamus Respondents to release her from ICE custody into the custody of Health and Human Services' Office of Refugee Resettlement (ORR), which is responsible for the care and custody of unaccompanied alien children. For the following reasons, the Court should deny the petition.

### I. Background[1]

On June 6, 2019, C.T.M. presented herself to United States officials at the San Ysidro California Port of Entry and requested asylum. She informed the U.S.

---

[1] This factual background is drawn from C.T.M.'s First Amended Petition (ECF No. 67), and the government's Response (ECF No. 32).

Customs and Border Protection (CBP) officials that she was a minor, and she presented a Congolese birth certificate showing a birth date of November 27, 2002. However, CBP determined C.T.M. was an adult and transferred her to ICE custody, where she remains pending removal proceedings.

C.T.M.'s journey to the United States began more than six years ago. She claims that, in 2014, thieves broke into her home in Kinshasa and physically assaulted and threatened her during a robbery. To protect her from escalating violence in the region, C.T.M claims, her father applied for a United States visa on her behalf. However, C.T.M. contends, her father misrepresented her age on the visa application by asserting she was born in 1993. C.T.M. insists she had no control over her father's misrepresentation of her age and that she was afraid of him because he regularly abused her. Her visa application was ultimately denied. C.T.M. further claims that, in 2016, militiamen of the Kamwina Nsapu rebellion beat and sexually assaulted her. She became separated from her immediate family members and, she believes, Kamwina Nsapu militiamen killed them. C.T.M. feared for her own safety and well-being. After the attack, she accepted help from strangers who took her to Angola. She claims to have suffered extreme trauma due to these events.

While in Angola, C.T.M. worked for a Brazilian couple. The couple decided to return to Brazil and take C.T.M. with them. C.T.M. alleges the couple arranged for her travel documents and her ticket, and they misrepresented her age to the Angolan government. She admits she left Angola briefly and returned to the DRC

to find her family. But she realized the DRC was still dangerous, and she was unable to find her family. She then flew to Brazil to meet the Brazilian couple. In Brazil, C.T.M. worked for the couple as a housekeeper and lived in their house. C.T.M. claims the couple trafficked her to Brazil and asked her to sell drugs for them. When she refused to sell drugs, the couple threatened to kill her; so she fled.

C.T.M. eventually travelled to Tijuana, Mexico, and on June 6, 2019, she attempted to enter the United States. She informed CBP officials that she was a minor and presented her Congolese birth certificate showing her birth date in 2002. However, CBP determined C.T.M. was an adult and transferred her to ICE custody. On November 20, 2019, ICE conducted an age assessment of C.T.M. by dental radiograph. The Dental Age Assessment Report concluded C.T.M. is 20.46 years old, plus or minus 4.87 years, and that the "empirical statistical probability of [C.T.M.] having attained 18 years of age is 84.35%." ICE thus determined C.T.M. was an adult, and she remained in ICE custody.

The next month, C.T.M.'s counsel filed a motion with the Office for Immigration Review asking the immigration court to review her age determination. On February 14, 2020, at a hearing before an immigration judge, C.T.M. presented evidence of her age, including her Congolese birth certificate, school records, an affidavit from a family friend, and her testimony that she was born in 2002. C.T.M. also explained the reason she believed her father had misrepresented her birth date on her 2014 visa application: her father may have done this to save her life as violence escalated in the DRC. C.T.M. states she

objected to admission of the dental exam evidence because it was unreliable, and she filed an expert statement noting that the dental examination was faulty and inconclusive. The immigration judge determined C.T.M.'s date of birth was November 27, 2002, and that she was therefore a minor.

On the same day the immigration judge determined C.T.M. was a minor, ICE officials attempted to transfer C.T.M. to ORR custody. ICE notified the ORR of the immigration judge's decision and provided documentation regarding C.T.M.'s age. But on February 14, 2020, and February 21, 2020, the ORR notified ICE that the ORR had concluded C.T.M. was an adult and therefore denied her placement with the ORR. On February 25, 2020, the Department of Homeland Security (DHS) filed a motion with the immigration judge explaining that the ORR had determined that C.T.M. was an adult and would therefore not take custody of her. The motion stated that, as a result, C.T.M. would not be transferred to the ORR.

On March 2, 2020, C.T.M. initiated this civil action by filing her original Petition for Writ of Habeas Corpus and Writ of Mandamus. Five days later, C.T.M. filed a petition for a temporary restraining order (TRO) seeking an order "directing ICE from treating C.T.M. as an adult and providing her medical treatment for her PTSD." Mot. 5  (ECF No. 8). On March 12, 2020, the District Court denied C.T.M.'s motion for a TRO, and on March 16, 2020, the District Court entered its Memorandum Opinion and Order further explaining its reasoning. Mem. Opn. and Order (ECF No. 22).

By her petition, C.T.M. claims DHS/ICE and the Department of Health and Human Services (HHS)/ORR erroneously determined she was an adult and transferred her to ICE custody rather than ORR custody. She claims her detention in an adult detainment center violates the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), DHS and HHS regulations, the Administrative Procedures Act (APA), international law, the Rehabilitation Act, the *Flores* Settlement Agreement, the Prison Rape Elimination Act (PREA), and her Fifth Amendment due process rights. She demands to be immediately released from ICE custody through a writ of habeas corpus or to be transferred to ORR custody through a writ of mandamus. She also seeks attorneys' fees, if she prevails in this case.

## II. Legal Standards

Before the creation of DHS in 2002, the care and placement of unaccompanied alien children in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service (INS). *See B.I.C. v. Asher*, 2016 WL 8672760 (W.D. Wash. Feb. 19, 2016) (citing *F.L. v. Thompson*, 293 F. Supp. 2d 86, 96 (D.D.C. 2003)). With the enactment of the Homeland Security Act of 2002 (HSA), Congress transferred to the ORR the responsibility for the care of any unaccompanied alien child "who [is] in Federal custody by reason of [his or her] immigration status." *See B.I.C.*, 2016 WL 8672760 at * 2 (citing 6 U.S.C. §§ 279(a), (b)(1)(A). The HSA also transferred to the ORR the responsibility for making all placement decisions for unaccompanied alien

children; required the ORR to coordinate these placement decisions with DHS; and required the ORR to ensure that unaccompanied alien children are not released upon their own recognizance. *Id.* (citing 6 U.S.C. §§ 279(b)(1)(C), (D), (b)(2)). These laws were amended in 2008 through the TVPRA, which placed the care and custody of alien children under HHS's jurisdiction. 8 U.S.C. § 1232(b)(1) (requiring that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services").

The TVPRA also directs "the Secretary of Health and Human Services in consultation with the Secretary of Homeland Security" to "develop procedures to make a prompt determination of the age of an alien, which shall be used by the Secretary of Homeland Security and the Secretary of Health and Human Services for children in their respective custody." 8 U.S.C. § 1232(b)(4). "[T]o carry out the TVPRA provision, HHS and DHS worked jointly to develop the age determination policies and procedures[.]" *See* Section 1.6 of ORR's Children Entering the United States Unaccompanied (ORR Guide)[2]. The ORR Guide provides that "HHS may make age determinations of [unaccompanied alien children] when they are in HHS custody on a reasonable suspicion that a child in HHS custody is 18 years or older." ORR Guide § 1.6.1. Under the ORR procedures, each case must be evaluated "based on the totality of all available evidence,

---

[2]    Available online at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-statesunaccompanied.

including the statement of the individual in question." *Id.* at § 1.6. If there is conflicting evidence regarding the age of an unaccompanied alien child, the Federal Field Specialist will make the age determination based on his or her review of the evidence collected by the care provider. *Id.* at § 1.6.1.

When conducting age determinations, ORR case managers are directed to seek the following evidence, but information from each category is not required: (1) documentation, such as official government issued documents and other reliable records that indicate the unaccompanied minor's date of birth; and (2) statements by individuals who can credibly attest to the age of the unaccompanied minor, including the unaccompanied minor. Generally, however, an unaccompanied minor's uncorroborated declaration regarding age is not used as the sole basis for an age determination. *Id.* at § 1.6.2.

When information regarding age is "inconclusive," case managers may use medical age assessment procedures, such as dental maturity assessments using radiographs. *Id.* The ORR Guide recognizes that "no medical assessment method can determine an exact age [so] best practice relies on the estimated probability that an individual is 18 or older." *Id.* "The examining doctor must submit a written report indicating the probability percentage that the individual is a minor or an adult . . . If an individual's estimated probability of being 18 or older is 75 percent or greater, ORR will refer the individual to DHS." *Id.* Further, the TVPRA provides that age determinations shall take into account multiple forms of evidence,

including the non-exclusive use of radiographs, to determine the age of the
unaccompanied alien. 8 U.S.C. § 1232(b)(4).

III. Analysis

A.      C.T.M. fails to show Respondents violated the TVPRA or its regulations.

C.T.M. argues Respondents violated the TVPRA and their own regulations.
First, she claims Respondents should have determined she was a minor at the time
she presented herself at the San Ysidro Port of Entry based on her testimony and
her birth certificate. First Amend. Pet. at 14. The ORR Guide provides that
Respondents may make an age determination when there is a "reasonable
suspicion" that an unaccompanied alien is over 18 years old.  ORR Guide § 1.6.1.
She claims her statements and birth certification should have been conclusive
evidence that she is a minor.  First Amend. Pet. at 20.  Respondents state that when
C.T.M. crossed the San Ysidro Port of Entry, her biometrics were compared with
her 2014 visa application. Pet. App. 125-26 (ECF No. 32-5). CBP officials
determined she was the same person who made the visa application, but her date
of birth on the visa application was November 27, 1993, which would mean she was
26 years old. CBP officials therefore did not transfer her to the ORR, but instead
transferred her to ICE custody as an adult.  *Id.* 128. The Court finds C.T.M.'s prior
visa application provided Respondents reasonable suspicion to believe she was an
adult. C.T.M. has therefore failed to show Respondents violated the TVPRA or their
regulations by determining that she was not a minor at the time she presented
herself at the San Ysidro Port of Entry.

8

C.T.M. also claims Respondents violated the TVPRA and their regulations when they failed to consider the totality of the evidence in determining her age. She states she provided Respondents with her identification card, certificate of graduation, school transcripts, a letter indicating her date of birth, her birth certificate, and oral testimony in support of her age claim. She alleges Respondents ignored this evidence and relied on an inconclusive and unreliable dental radiograph. She also claims Respondents failed to "adhere to or respect" the immigration judge's age determination. First Amend. Pet. at 36.

The record, however, shows Respondents did not rely solely on the dental radiograph to make their age determination. Respondents submitted a declaration from ICE Assistant Field Office Director Kelei Walker identifying the evidence she reviewed and explaining her analysis of that evidence. Walker stated, in pertinent part:

> 8.    First I want to share my analysis of the documentation Ms. C.T.M. provided regarding her claimed date of birth of November 27, 2002.
>
>    a.    I reviewed a copy of a primary school certificate from the educational province of Kinshasa "delivered in Kinshasa on July 02, 2010," which lists her Date of Birth (DOB) as November 27, 2002, a true and correct copy of which is attached hereto as Exhibit 1. The document refers to a "T[.] M[.]" with no first name provided. Further, the certificate, which is dated 2010, references an executive order dated February 11, 2014. This indicates to me that the document is likely fraudulent.
>
>    b.    Another document I reviewed is a copy of a report card for school year 2005-2006, a true and correct copy of which is attached hereto as Exhibit 2. On this document,

there is no first name listed. The date of birth on the report card is November 27, 2002. Given the stated age of the student, it appears the student would have been two years old at the beginning of the school year. There is also a reference to the child being male ("The pupil doubles his class."). This indicates to me that the document is likely fraudulent.

c.      I also reviewed a similar copy of a report card for school year 2004-2005, a true and correct copy of which is attached hereto as Exhibit 3. Given the November 27, 2002 stated birthdate of T[.] M[.], it appears the student would have been one year old at the beginning of that school year. This also indicates to me that the document is likely fraudulent.

d.      Another document I reviewed appears to be a copy of a student identification document, a true and correct copy of which is attached hereto as Exhibit 4. The document provides the name of C[.] T[.] M[.]. It bears a date of birth of November 27, 2002. The photo on the ID document is unidentifiable. There is no date for this document. Because the photo is unidentifiable and the document is undated, I give this document less weight.

e.      Another document I reviewed is a copy of an "Act of Birth Certification," a true and correct copy of which is attached hereto as Exhibit 5 . . . . First, I note that the document indicates C.T.M.'s mother appeared before the Registrar in 2019. However, the document also includes the following statement: "In witness whereof, we drafted together the present certificate with a date of 10.12.2011." Thus, there is an eight-year discrepancy in the document itself. Second, I would note that in C.T.M.'s affidavit submitted in support of her Temporary Restraining Order, she indicates that is unaware of the location of her mother. However, this document indicates she knew where her mother was as of May 2019.

f.      I also reviewed a "Birth Certificate" dated May 29, 2019[.] . . . The document says that "it emerges from the documents I have in my possession that the person named [C.T.M.]" is "currently living in Kinshsa" and was

"indeed born in Kinshasa on November 27, 2002." . . . On May 29, 2019, C.T.M. did not live in Kinshasa. Also, if the document was prepared on the 31st of May, that was only a few days before C.T.M. entered the United States on June 6, 2019. This indicates the document is suspect.

9.    I have not reviewed the originals of any of these documents. In my assessment of determining whether or not to believe C.T.M. regarding her claim of being a juvenile, I give significant weight to the fact that she has presented what appears to be fraudulent documents with major inconsistencies on them. I also give significant weight to the fact that she has now admitted to providing a false date of birth while in Nicaragua, as noted in paragraph 12(a).

10.    In my capacity supervising our intelligence officers in Dallas and in communications with our headquarters juvenile unit, I am aware that it is not uncommon for aliens seeking admission and other benefits to present fraudulent documentation that they are minors. This is because the law provides certain benefits to unaccompanied minors such as the ability to file an asylum application before the asylum office instead of the immigration court.

11.    I would also note that I wanted to take a statement from C.T.M. along with another female officer in the presence of C.T.M.'s counsel to obtain additional biographical information as part of our consideration of her age. However, as her counsel objected to the statement, we did not take it.

12.    In addition to the above documents, I have also reviewed some recent information that I consider relevant to this matter. It is my understanding that none of the information below was presented to the Immigration Court at the February 14, 2020 hearing, other than the information from the CCD database and some questions about the passport she used to apply for this non-immigrant visa.

   a.    In C.T.M.'s sworn statement submitted pursuant to her request for a Temporary Restraining Order, she admitted that she knowingly put 1996 as [her] year of birth on a document she obtained in order to travel through Nicaragua for benefits she believed she would receive as an adult. Thus, C.T.M. admits that at least one time she intentionally misrepresented her age to a government.

b.      I have reviewed information about C.T.M.'s visa application from the Department of State's Consular Consolidated Database (CCD), specifically, a printout generated by one of my enforcement officers, a true and correct copy of which is attached hereto as Exhibit 7. This reflects that C.T.M. applied for a non-immigrant visa that was denied on January 23, 2014. *Id.* at 2. The application material reflects that C.T.M. submitted a passport in support of the application with the number OB0410868 with a date of birth of November 27, 1993. This passport purports to have been issued July 23, 2012. *Id.* at 2. Based upon her current claimed age of 17, she would have been 9 when the passport was issued, but the passport would have reflected she was 18 years old. It is not reasonable to believe that a 9-year-old could have passed for a 18-year-old.

c.      Another noteworthy piece of information on the CCD report is that it includes a "FINS" number. This is a numeric representation of an applicant's fingerprints. The number is a unique identifier of the applicant's unique fingerprints. Her FINS number is 1162319202. As it is my understanding that such fingerprint information can only be obtained in person, C.T.M. must have appeared personally for her interview with U.S. consular officer in the Congo. The report also shows an appointment date of January 23, 2014. If her claimed date of birth of 2002 was true, she would have been an eleven-year-old posing as a twenty-year-old at the time of her interview. While I do not believe that C.T.M. has specifically said she did not appear at the consular office, I understand she has always maintained that it was only her father who submitted the application for a non-immigrant visa.

d.      Another important source of information we considered in determining C.T.M.'s age is information from "BITMAP" (Biometric Identification Migration Alert Program). This is a recent partnership between the United States Government and other governments that allows the United States to access information

12

about applicants in transit to the United States. This allows the United States to receive information about aliens migrating north through South and Central America to the United States. Foreign law enforcement personnel will ask for key biographic information about migrants and such data will be entered into U.S. Government databases. Foreign officials will solicit the required biographical information from the individual for manual entry into the system at each encounter. I have reviewed BITMAP data available for C.T.M. that was generated by an ICE officer in our Headquarters office, a true and correct copy of which is attached hereto as Exhibit 8.

i. The "BITMAP" data reflects an encounter on March 15, 2019 with a person named [C.T.M.]. Her 1162319202 FINS number appears, showing the same individual that applied for a non-immigrant visa, as described in paragraph 12(c) above, was fingerprinted. Her picture was taken as well. The data indicates an encounter in Panama. The encounter reflects that CTM communicated a date of birth of 11/27/96, and a country of birth of the Democratic Republic of the Congo.

ii. The "BITMAP" data reflects a second encounter on April 5, 2019 for a person named [C.T.M.]. Her 1162319202 FINS number appears, showing the same individual that applied for a non-immigrant visa, as described in paragraph 12(c) above, was printed. Her picture was taken as well. The data indicates an encounter in Costa Rica. The encounter reflects that C.T.M. communicated a date of birth of 11/27/96. The encounter reflects her citizenship to be Haitian.

iii. The "BITMAP" data reflects a third encounter on April 21, 2019 for a person named [C.T.M.]. Her 1162319202 FINS number appears, showing the same individual that applied for a non-immigrant visa, as described in paragraph 12 (c) above, was

printed. There appears to have been no photograph taken. The data indicates an encounter by the Mexican Immigration authorities. The encounter reflects that C.T.M. communicated a date of birth of 11/27/96 and a country of bi1th of the Democratic Republic of the Congo.

iv. In short, the BITMAP data indicates that in 2019 C.T.M. represented her birthday as November 27, 1996, to all governments she encountered other than the United States.

e.    Another source of information I considered in considering C.T.M.'s age is her application for a visa from Brazil. Our ICE attaché officer in Brazil obtained this information from the Brazilian authorities, a true and correct copy of which is attached hereto as Exhibit 9. The information reflects that the visa was granted on February 2, 2018 and that she entered Brazil on February 4, 2018. The information reflects an application and approval of a visa to go to Brazil for research and educational purposes for [C.T.M.], date of birth 11/27/1996. The documentation reflects a Passport number of OPO178662. This is a different passport number than the first passport provided to the Department of State in January 2014 and presumably reflected a 11/27/1996 DOB since that was the DOB provided pursuant to her non-in1migrant visa application.

f.    One of our ICE officers also obtained some information from the Brazilian authorities reportedly from C.T.M. The Brazilian official who responded to the request indicated that she only had a record of a visa application that was not granted. However, she included a document that appears to be a certificate of vaccination dated July 5, 2014 filled out by C.T.M. with a date of birth listed as November 27, 1996, a true and correct copy of which is attached hereto as Exhibit 10. Open Source information also indicates that C.T.M. attended a university in Brazil and participated in university activities and classes there. I do not have

certified copies of these documents, but I will make them available when I do.

13.    As I noted above, I am aware that the Immigration Judge found that C.T.M. was a juvenile and that the transcript was provided to ORR. I know that he did not have much of the evidence that I considered in making my decision since we did not have the evidence at the time of the hearing. Typically, the BITMAP data is not used by attorneys for use at immigration hearings since it is law enforcement sensitive material.

14.    In any event, the Immigration Judge's responsibility is not to determine whether an alien should be in ICE or ORR custody. Such a finding is the responsibility of ORR and ICE through their age determination process. In addition to protecting unaccompanied minors from adults, we also strive to ensure that adults are not placed with minors.

15.    After the Immigration Judge's finding on February 14, DHS also conducted a bone density test for C.T.M, a true and correct copy of which is attached hereto as Exhibit 11. The results indicated that "the estimated mean chronological age for a female with and wrist development equal to that if this subject is 18.0 years+/- 2.5 years." However, the report also noted that "the wrist and bones of C.T.M are fully developed. The staging for the development is at the terminal staged for this assessment method. There is no evidence of when [C.T.M] reached this terminal state. That means she could be older than the interval reported above." This evidence along with the dental exam is probative of her being over 18 years old.

Resp. App. 131-133 (ECF No. 32-5).

Additionally, ORR Field Supervisor James De La Garza submitted a report

stating he determined C.T.M. was not a minor by reviewing: (1) her January 22,

2014, visa application showing a November 27, 1993 date of birth; (2) her April 2, 2018 student visa application to Brazil showing a different passport number than her 2014 visa application and showing a birth date of November 27, 1996; (3) an April 5, 2019, BITMAP record showing an encounter with government officials where she listed her country of birth as Haiti and a November 27, 1996, date of birth; (4) an April 21, 2019, encounter with Mexican government officials in which she informed them her date of birth was November 27, 1996; and (5) a packet of documents submitted by C.T.M. that included her birth certificate, school records, testimony from people familiar with C.T.M., and other records. Resp. App. 5.  De La Garza concluded C.T.M. was an adult, stating:

1.   [C.T.M.] attempted on numerous occasions to enter a country other than her native country of the Democratic Republic of Congo as an adult.

2.   She attempted to enter the US in 2014 as an adult and based on her record of application it is unreasonable to believe that she did so at the approximate age of 11.

3.   DHS biometric records are reliable and verify that C.T.M. is the same person who attempted on multiple occasions to enter another country as an adult.

4.   Other records provided to this ORR representative are contradictory forms of information attesting to age. These documents include school records, records of a passport, birth certificates, and photos. Because these records are to the knowledge of ORR and DHS not verified they do not serve as verified records or evidence of birth or age.

Resp. App. 127.

16

The record shows Respondents did not exclusively rely on the dental radiograph to make their age determination. Instead, Respondents considered the totality of the evidence as required by the TVPRA and their own regulations. C.T.M.'s claim that Respondents violated the TVPRA and their own regulations should be denied.

B. <u>C.T.M. fails to show Respondents violated the APA.</u>

C.T.M. argues Respondents' age determination was arbitrary and capricious in violation of the APA. The APA authorizes a court to set aside agency actions that are "arbitrary, capricious, an abuse of discretion" or otherwise "not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010). The Court must "determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a 'reasonable explanation for how it reached its decision.'" *Assoc. Builders and Contractors of Tex., Inc. v. NLRB*, 826 F.3d 214, 219 (5th Cir. 2016) (citing *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999). "This standard is highly deferential; we apply a presumption of validity." *Id.* (citing *Tex. Clinical Labs, Inc.* v. Sebelius, 612 F.3d 771, 775 (5th Cir. 2010)).

C.T.M. argues the evidence used by Respondents is unreliable, and that she has presented "a more rationale interpretation of each fact known to be considered by Respondents." First Amend. Pet. 20. She responds to the findings of Field Office Director Kelei Walker by explaining the discrepancies

in the evidence. For example, C.T.M. states that her 2014 visa application contained a fraudulent birth date because her father lied about her age, and that she "cannot be held responsible for representations made by her father." *Id.* 11. She also explains that her student visa to Brazil was arranged by the Brazilian couple and "it is reasonable to conclude that *they were the ones that lied to the Angolan government regarding C.T.M.'s age*" and that the Brazilian couple was "in fact trafficking her." *Id.* She states her school certificate could be dated 2010 and contain references to a 2014 executive order because "it could simultaneously be true that the certificate was *delivered in 2010 when the session ended*, but the current copy of the certificate was created on a different date; the certificate could have been requested after 2014 and the certificate reflects it is in compliance with standards created by the executive order in 2014." *Id.* 12. Additionally, although her birth certificate states she "currently lives" in the Congo, she explains "[i]t should be understood to state that her parents live or lived in Kinshasa," and "it is plausible and reasonable that the registrar used the information of the parent's last known address when issuing the document as C.T.M. did not have a death certificate to show the registrar her parents were dead or any other information related to her parents whereabouts." *Id.* 12-13. She also states her report card contains a mistranslation of a noun "making the report card read as if C.T.M. is a male student." *Id.* 13. However, she does not explain how she could have attended school when she was one and two years old.

18

C.T.M. also claims Respondents' emails show they are biased against her. She states that a neutral factfinder would have found her to be credible, and that the immigration judge found her age claim to be credible. Respondents state that it did not submit all of the age determination evidence to the immigration judge because they had not yet obtained some of the evidence at the time of the immigration hearing and because BITMAP data is not typically used in immigration hearings because it is law enforcement sensitive. Resp. App. 133. Respondents further state that the purpose of the immigration hearing was not to determine whether ICE or ORR should have custody of C.T.M., but it was to determine if the immigration court had jurisdiction over C.T.M.'s removal proceedings. Finally, Respondents state the immigration judge's determination of C.T.M.'s age is not binding on their age determination decision because it is Respondents' responsibility to ensure adults are not detained with minors.

C.T.M.'s explanations of the discrepancies in her evidence do not establish that Respondents' age determination was arbitrary or capricious. The record shows Respondents "examined the pertinent evidence, considered the relevant factors, and articulated a 'reasonable explanation for how it reached its decision.'" *See Assoc. Builders and Contractors of Tex., Inc.*, 826 F.3d at 219. She has also failed to cite any authority that the immigration judge's age determination was binding on Respondents. C.T.M.'s APA claim should be denied.

19

C.T.M.'s failure to establish a violation of the APA is fatal to her request to compel Respondents to determine she is a minor, release her from adult detention, and transfer her to HHS custody. The APA offers similar means of compelling agency action as the federal mandamus statute. That means, for the Court to compel agency action, C.T.M. "must demonstrate that an administrative agency 'has failed to take a *discrete* action that it was *required to take*.'" *Yan v. Mueller*, 2007 WL 1521732, at *8 (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)). C.T.M. has not shown that Respondents have failed or refused to examine the evidence regarding C.T.M.'s age or make a determination of her age based on that evidence. That Respondents reached a conclusion C.T.M. disagrees with does not entitle her to relief under the APA.

C.    C.T.M. fails to show Respondents violated her due process rights.

C.T.M. argues Respondents violated her substantive and procedural due process rights under the Fifth Amendment. She states, "C.T.M.'s substantive due process rights are violated by her unjustified detention in an adult detention facility. . . . She is being deprived of the heightened level of care and treatment that would be due a child in HHS/ORR accommodation." First Amend. Pet. at 16.

To show that Respondents violated her substantive due process rights, she must establish that Respondents' conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see also U.S. v. Guidry*, 456 F.3d 493, 506–07 (5th Cir. 2006) (stating the government's actions "violate another's substantive due process rights when their actions 'can properly be characterized

as arbitrary, or conscience shocking, in a constitutional sense.'") (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). This "standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (quoting *Roseles-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018)).

C.T.M., however, has not established that Respondents' actions shock the conscience. She has not shown they violated any law or regulation in determining she is not a minor. She has therefore failed to show Respondents violated her substantive due process rights.

C.T.M. claims Respondents violated her procedural due process rights when they: (1) failed to treat her as a minor from June, 2019 to November, 2019 while they were determining her status; (2) made the age determination based on opinions by individuals she was not allowed to challenge; (3) relied on evidence that C.T.M. was not allowed to view; (4) made unfounded interpretations of facts without a rational basis; (5) failed to allow her an adequate opportunity to correct their mistaken conclusions; (6) failed to provide sufficient reasons to overcome the immigration judge's determination that she is a minor; and (7) threatened her with criminal prosecution in an attempt to coerce her into withdrawing her claim. First Amend. Pet. at 20-21.

"The requirements of procedural due process are flexible and call for such procedural protections as the particular situation demands. At a minimum, due

process requires that notice and an opportunity to be heard be granted at a meaningful time and in a meaningful manner." *Gibson v. Tex. Dep't of Ins.—Div. of Workers Comp.*, 700 F.3d 227, 239 (5th Cir. 2012) (citation and quotation marks omitted). Here, C.T.M. has not shown that the procedures used by Respondents to determine her age were insufficient. Respondents provided C.T.M. the opportunity to submit evidence in support of her claim that she is a minor, and C.T.M. submitted evidence that included her birth certificate, school records, testimony from people familiar with her, her testimony from the immigration court, her sworn declaration, and other documents. Resp. App. 5; 24-3. Respondents state they also requested that C.T.M. submit any further evidence that supports her age, and "[t]o date, none has been provided." Resp. 9-10. Respondents have also filed in this case the evidence and reasons explaining the basis for their age determination.

Although C.T.M. claims Respondents' evidence is unreliable and that she "has presented a more rational interpretation of the facts," First Amend. Pet. at 20, she has failed to cite any support for her claim that she was entitled to additional procedural due process, or that Respondents are bound by the immigration judge's age determination. Finally, she has failed to establish that Respondents threatened her with criminal prosecution. In support of this claim, she attaches an email from her counsel to Respondents asking if Respondents, "have ever indicated to CTM that she may be liable to criminal prosecution?" First Amend. Pet. Ex. 12 at 4, and emails from Respondents' counsel discussing

C.T.M.'s counsel's motion to withdraw in the immigration case and stating that "if any representations that have made to the court are now known to you to be false – for example, regarding CTM's claim to be a minor – you have an obligation to correct them."  Pet. Supp. App. 3, 57-3 (ECF Nos. 57-2). These email exchanges fail to establish a due process violation.

The record demonstrates that ICE and the ORR made independent age determinations under the joint procedures mandated by the TVPRA, and both agencies concluded that C.T.M. is an adult, based on the totality of the evidence before them. C.T.M. has not shown any erroneous deprivation through the procedures used by ICE or the ORR. Therefore. C.T.M.'s due process claims should be denied.

D.    <u>C.T.M. fails to show Respondents violated the Rehabilitation Act.</u>

C.T.M. claims Respondents violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq*., which provides:

> [n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794. This statute—and DHS's implementing regulations, *see* 6 C.F.R. Part 15—require accommodations for qualified individuals with disabilities who are in custody in order to provide an equal opportunity to participate in DHS programs.

According to C.T.M., she has been "forced to pursue her claims for protection while suffering from PTSD without any express accommodations for her serious condition being made." First Amend. Pet. 25. But C.T.M.'s allegations fail to state how she has been discriminated against; she fails to explain what accommodations are necessary, why they are necessary, and how the alleged lack of these accommodations violates the Rehabilitation Act. Respondents have also submitted medical records showing that C.T.M. is being treated for her mental health issues while in detention. Resp. App. (ECF No. 41-2). C.T.M. further claims that her "continued detention violates the Rehabilitation Act because federal law prohibits the detention of a minor with adults." First Amend. Pet. 25. C.T.M., however, has failed to establish Respondents violated any law or regulation in determining she is not a minor. For these reasons, her claim under the Rehabilitation Act should be denied.

E.    C.T.M. is not entitled to relief under international law.

C.T.M. claims international law prohibits the government from acting in a manner that is not in the best interest of a child. She states, "this prohibition is found in numerous treaties, including article 3 of the Convention on the Rights of the Child, 1577 U.N.T.S. 3 (1989)." First Amend. Pet. 30. C.T.M. acknowledges, however, that the Convention on the Rights of the Child has not been ratified by the United States. She also fails to cite any authority for her claim that a treaty or other international law creates a private right of action entitling her to relief. This claim should be denied.

F.    <u>C.T.M. is not entitled to relief under the *Flores* Settlement Agreement.</u>

C.T.M. claims she is a minor and argues that Respondents have violated her rights under the *Flores* Settlement Agreement and the regulations implementing the Agreement, 8 C.F.R. § 1236.3(d). In 1997, the *Flores* Settlement Agreement created minimum requirements and guidelines regarding the conditions of confinement for juveniles to ensure their well-being and safety. *See Flores v. Reno*, Case No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997), https://www.aila.org/File/Related/14111359b.pdf. The *Flores* Settlement Agreement, however, applies only to minors. *Id.* Because C.T.M. failed to establish that Respondents unlawfully determined she is an adult, she failed to show the protections of the *Flores* Settlement Agreement apply to her. This claim should be denied.

G.    <u>C.T.M. is not entitled to relief under the Prison Rape Elimination Act.</u>

C.T.M states that, "although perhaps not giving rise to an express cause of action, the [PREA] emphasizes that victims of sexual violence must be provided special treatment. Reference to this Act is appropriate in interpreting agency regulations and policies as the Act is intended to provide protection to individuals such as C.T.M., who has been subjected to the most horrifying sexual abuse of gang-rape by perpetrators who likely killed her immediate family members." First Amend. Pet. 29.

As C.T.M. acknowledges, the PREA, 42 U.S.C. § 15601, *et seq.*, does not create a private right of action. Instead, it was "'drafted to address the problem of

rape in prison, authorize grant money, and create a commission to study the issue; it does not give prisoners any specific rights.'" *Dudley v. United States*, 2020 WL 532338, at *7 (N.D. Tex. Feb. 3, 2020) (*quoting Johnson v. Rupert*, 2014 WL 6969202, at *5 (E.D. Tex. Dec. 9, 2014)); *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015) (stating that "any claim raised under PREA is properly dismissed," and that "[i]nsofar as [the inmate] argues that his rights under the Prison Rape Elimination Act . . . were violated, other courts addressing this issue have found that the PREA does not establish a private cause of action for allegations of prison rape" (citations omitted)). Therefore, to the extent C.T.M. seeks relief under the PREA, the claim should be denied.

H.    C.T.M. is not entitled to mandamus relief.

Under the federal mandamus statute, a district court has original jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. But mandamus relief is considered a drastic remedy reserved for extraordinary situations. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). And mandamus relief is appropriate "only when the plaintiff's claim is clear and certain and the duty of the officer is ministerial and so plainly prescribed as to be free from doubt." *Giddings v. Chandler*, 979 F.2d 1104, 1108 (5th Cir. 1992) (internal quotation marks omitted). C.T.M.'s claims do not meet this standard.

C.T.M. demands Respondents perform their duty to determine she is a minor, release her from adult detention, and transfer her to HHS custody. But

making an alien age determination is a discretionary action by ICE and the ORR. The record here shows that Respondents complied with the applicable laws and regulations and determined C.T.M. is a minor. This determination, made after considering multiple forms of evidence, was not arbitrary or capricious. It is not "clear and certain" that Respondents owe C.T.M. a duty to release her from adult detention based on her assertion that she is a minor. Thus, C.T.M. is not entitled to mandamus relief.

IV.

The Court should deny C.T.M's petition for mandamus and a writ of habeas corpus.

Signed July 1, 2020.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

28